May it please the Court. My name is Terri Scott Olivino and I'm here representing the child's parents in this appeal from the District Court decision that gave deference to an SRO decision, a State Review Officer decision, in an educational case that we find was not well reasoned. The Department of this decision was well-reasoned simply because it was a 26-page single-space decision. Half of that decision talked about the procedures that got us to the District Court. The level of deference that this Court has found that the courts themselves must give to State Review Officers and officers of the high but limited. And with the limitation of that deference for the State Review Officer decision and the impartial hearing officer's decision is a well-reasoned decision that is supported by the record. I'm a little puzzled. What's the difference then between deciding whether the opinion is well-reasoned and deserves deference and deciding on the merits that we don't agree with the analysis? The analysis itself from the SRO and the District Court discounted quite a lot of information about the child and in fact that information came from the only evaluations that were presented during the impartial hearing which are The Court has actually found that if the DOE may choose not to do their own reports and evaluations and testings, but if they choose to rely on those given to them by the parents, then the IEP itself, the Individualized Education Program, must be consistent with the recommendations of those evaluators. In this case the DOE did none of its own evaluations. They did none of their own testing, but the IEP, the finalized IEP of June 2013, was inconsistent with every single one of the recommendations of those evaluators, namely that the child continue in a very small specialized special education class as he had been in preschool. I do understand that going from preschool to and services that may be provided. But they took a child who a neuropsychologist, a medical doctor, all his teachers, all his service providers recommended this small class. So basically you're saying the SRO was wrong? Yes. Right. Okay. So I'm not sure I get the two-level, and this was my question, you seem to be saying first we decide that it was wrong and therefore we don't give it deference, and then without giving it deference we proceed to decide whether it was right or wrong, but we've already decided it was wrong. I mean, you're basically asking us to review more or less de novo the decision of the review officer and decide that it was incorrect, right? Absolutely. That's exactly what I'm asking now. The SRO, the district court upheld the SRO's opinion, believing that they had a better understanding of the case and that the court shouldn't interfere with an educational decision. But I mean, don't they? To an extent, absolutely. But again, the decision in this particular case by the SRO, because it's not based on the actual evaluations that were done of this child, it's not based on the record. It's not based on the testimony of those evaluators. But so you're saying the ‑‑ if we accept the evaluations of the child's situation or the child's abilities, we therefore necessarily are required to accept ‑‑ and the department and the reviewing authorities are required to accept the recommendations of those people? In this case, I believe that's exactly it. You say in this case. So I always thought that the test was whether the SRO, IHO and so on adequately considered all of the evaluations in connection with arriving at its decision. But you started your answer to Judge Lynch with in this case. What do you mean by that? And am I right about that that's the general test is whether it ‑‑ The general rule is that the SRO and the IHO have better information about the education programs that are offered. Again, in this case, in New York City. But a decision has to be well reasoned. And the reason why it's wrong and therefore shouldn't be given deference is because this court has found that if you don't rely on these evaluations, which are the only ones we have, the DOE chose not to do their own evaluations and testing, then the IEP must be consistent with those recommendations. And in this case, in this particular case, that is not the fact. Weren't there some confounding factors? The child was moving from preschool to kindergarten. He had shown some improvement. And there was a competing interest in integrating him to a larger pool of students. So they still retain the one‑to‑one, but they tweaked some other aspects of it. And maybe they were wrong, but it wasn't like ‑‑ it wasn't based on anything that suggested that that would be a reasonable course. I believe and I agree that the transition from preschool to kindergarten, especially when it comes to socialization, certainly is a difference. And I believe that that's some of why there is a difference between the Committee on Evaluation IEP and then the CSE Evaluation IEP that was only done three days later. I believe that that's because they were considering more so that transition from preschool to kindergarten. Isn't that reasonable? I mean, what they're ‑‑ aren't we faced here essentially with a choice by the department to prioritize mainstreaming? And therefore, they've chosen a classroom that has the same teacher‑student ratio, plus this child is getting a one‑to‑one behavioral specialist to work with him throughout, in preference to a 12‑to‑1. I mean, it's 22‑to‑2 in terms of ratio of teaching professionals to students, instead of 12‑to‑1, which sounds to me like exactly the same ratio, plus it has the benefit of mainstreaming, plus the student has still a dedicated instructor for himself. So I'm having a little trouble understanding why this is an unreasonable decision to make, notwithstanding the recommendations of the people who essentially worked with him in the preschool setting. I do disagree that the ratios are the same. The ICT class, the only information that we have that the ICT class is capped at 22 students is that of the district social worker. That class can be upwards of 32 students. The ICT class ‑‑ When you say ‑‑ excuse me. When you say the only evidence we have of that is what the district social worker says it is, what is the contrary evidence then? The only evidence is, this is what the official of the Board of Education says this program is. Okay. Well, is there some contrary evidence that it isn't that? Well, from comparing ICT classrooms in New York City, they are not 12 to 1 to 1 classroom was not the same as an 8 to 1 to 1 classroom. So we're talking the difference between four students. Well, it's not by ratio. Excuse me. It's not by ratio. Twelve to 1 to 1 and eight to 1 to 1 are different ratios. We're talking a teacher to student ratio. And, yes, I agree one's 8 to 1 and the other's 12 to 1. But even that increase this Court held was not appropriate for the student because of their level of distractibility. Yes. But this student has a singular person to help focus him. So that's why I'm having trouble with the argument that was made that there wasn't sufficient attention to behavioral issues. The substance of what's given is somebody to work with him full time on behavioral issues, right? The 1 to 1 crisis paraprofessional was assigned to him in the ICT class. That was in his preschool class, in his 12 to 1 to 1 preschool class, he had a plus 1, a 1 to 1 crisis paraprofessional. Right. I understand that. But in terms of his distractibility, that's what this person is supposed to work on. Correct. And that 1 to 1 in the 12 to 1 to 1 class wasn't completely effective in reducing his distractibility. There were also issues that the child continuously narrates the day's events out loud in the classroom. We're talking about an ICT classroom with 60% general education students. One teacher is special ed. The other is a general education teacher. This is a child also during the day. But you want him to be in a class that is 100% special education students. Is that not right? I do. In this case, I believe he needs it. And in fact, in the successive IEPs, the DOE admits that he needed to be in that 12 to 1 to 1 classroom. Every single IEP thereafter. But that's thereafter. I understand that. Each year stands on its own footing. So what I'm having trouble understanding is why we should infer, even if it was the case, that with the benefit of hindsight, maybe this didn't work out. That's not the standard. But the standard also doesn't insist that a parent place the child in a setting that they know is inappropriate and allow him to regress before we play catch-up. It's much more dangerous in a child to play catch-up. But we're not, no, the question is, we look at this as of the moment that the decision is made. When we don't have the benefit of some hindsight as to what may have worked and what may not have worked, we're asking was there a reasonable decision made at the time? I agree. And it is my belief that according to the holdings in AM versus the New York City DOE, this court found that if the IEP deviates from the evaluator's recommendations, that it's inconsistent and not offering a FAPE, a free appropriate public school education. And in fact, in A&M, this court found that reasoning as inescapable. If it is inconsistent with the evaluator's recommendations, which this IEP is inconsistent with every evaluation recommendation made by the child's teacher, by the neuropsychologist, by the child's medical doctor, that makes the IEP inconsistent. If the IEP is inconsistent with those evaluations, it's substantively violating this child's right to a free and appropriate public school education. This child would not have learned in an ICC class. So essentially you're saying it is our — it is the rule of this circuit that we don't need to have meetings, discussions among the — of the committee. We just take what the evaluators presented, but unless they're going to do their own testing, they're required to accept the recommendations. This — the group that made the evaluations essentially dictates the IEP. I believe in a sense it does, because these are his educational evaluations. This is the testing that was done. An IEP in and of itself is looking into the future. But these tests and these evaluations and these observations are our best basis to look into that future. I think we have your arguments. Thank you. You've reserved three minutes for rebuttal, and we'll hear from Mr. Slack. May it please the Court, Devin Slack on behalf of the Department of Education. The District Court put the emphasis right where it belonged, and that was on deference to the SRO's determination. I'd like to correct, or at least clarify one thing that my colleague had just mentioned. Even if this Court were to conclude the SRO was wrong and it shouldn't, that just means the Court would ordinarily defer to the IHO. But the IHO, like the SRO, like the District Court, they all agreed that what we had here was a program that was reasonably calculated to ensure that this child would progress. That is where it is required. It is not a standard of perfection. It is one — it is a predictive judgment as to what is appropriate to the child's needs. And there is no doubt here that the CSE took into account the full breadth of the evaluations. They just disagreed with the bottom-line program that would meet those, partly because the IDEA expresses a strong preference in favor of integration over segregation. And at the end of the day, what this case really boiled down to was, one, the parents believed that he needed a more restrictive environment, and the DO believed he could progress in one that was less restrictive, but one that was still stronger. Do you agree that there may be a case where the quantity, quality, and scope of the evaluations is such that it would, under just about any circumstance, dictate what the IAP says or does? I think there could be. What would that be? What would that look like? It's hard to say. I mean, in — I think that that's — — in AM, there is — so in AM, there was near-universal agreement as a particular methodology in the teaching. But what we have here is really more just a disagreement of, what's the fit that makes sense that's a predictive judgment as to this child? And it's not black or white. Like, I think everyone has to agree that this is, at the very least, subject to reasonable disagreement. By the way, I went back and looked at AM because I hadn't remembered it the way your adversary suggested it, and am reminded that that was a district court decision. Is that right? I do believe that there was a decision in this court as well. It was affirmed by this court? Yes, I believe. If not in full, then at least in part. And there is — and in there, there was near-universal agreement among everyone who participated in the CSE, to my understanding, near-universal agreement as to a particular methodology for teaching a student that was on the autism spectrum. Something fundamentally different here. If you look at the evaluations themselves, no one disputes that the child has shown growth. He's shown quite a bit of progress. He responded well to one-to-one intervention. And it really just came down to a disagreement as to whether that intervention should be in an ICT classroom with one-to-one intervention and other supportive services, or should it be in a more restrictive environment in a specialized class in a specialized school. Those are the kind of quintessential judgments as educational policy that are reserved to school officials. And I'm hearing everyone agreed on that point. I'd like to just briefly talk about J.C. that was mentioned by my counsel, and mention their reply. It's a non-precedential summary order from this court, so that — it only goes so far. But even there, I just want to mention that the — part of the problem was that the SRO, I believe, had focused exclusively on ratio, and miscalculated it because he treated, or she treated, all of the adults in a classroom as if they were functionally equivalent. That's not the case here. We have — there's no dispute that the SRO and the IHO all understood what the ICT classroom would be. It was a special education teacher, a general education teacher, no more than 12 students with disabilities, and then a 40-60 split between students with disabilities and those without them. That was closely looked at. It was exhaustively thought about. It wasn't overlooked. Nothing was. And — sorry, just one concluding point, if there's no other questions from the bench. But I'd just like to briefly address a misimpression that's left from my adversary's reply. I don't think it really, in the end of the day, matters, but there was an FBA and a BIP prepared in this case. There was a typo in the IEP saying that it wasn't. But you can find that at — I believe it's at 1539 in the confidential appendix. I might not have that right. But on top of that, it was prepared. It was discussed in the — in the two meetings. You can see — So you say no procedural errors? No. I think there — I would admit that the FBA and the BIP did not fully live up to the standards of that. But in the end of the day, as the SRO and the HIO both agreed, it didn't deprive the student of a free and appropriate education because not only were they prepared, they were also coupled with an IEP that discussed the problem behaviors, the intervention methods. It provided five annual goals. You can see that at 1563 to 65 that were specifically directed at those. And it provided a one-to-one question. I'm sorry. Where is the BIP? You said 1539. I thought it was 1539. I might have missed — I don't know that I would recognize a BIP if I saw one. But would you double-check? Sorry. It's 1549 is the FBA. 1549. Okay. And the BIP starts on 1551. Got it. A lot of the work is actually done in the IEP on pages six to eight of the final IEP. And most importantly, it provided for a one-to-one query as a paraprofessional to address the staying with a child throughout the day to make sure he paid attention to task, to address his safety needs, his distractibility, and all things to that. No further questions? Rest of our brief. Thank you. Thank you. I only have a few moments to discuss some of the points of my adversary here. The one thing I do want to mention that has not been mentioned before is the deference argument as far as the IHO's decision regarding the Burlington-Carter test. Burlington-Carter test is where, if the child is not provided with a free and appropriate public school education, that the Department of Education will reimburse the parent for that private education if the equities support that. The test for equities is whether the parents frustrated the course of the IEP. In this case, they did not do so, and the IHO actually found that the Cook School where the child was placed was an appropriate placement for him. And that was after testimony and all of the school and educational records that were before the IHO. So I wanted to just make that one point. The Department of Education really is making a point that there's a floor on what a free and appropriate education is. The courts have been very specific, and in fact, in Andrew F. recently, the Supreme Court had said that a de minimis education amounts to no education at all. I do agree that the Department of Education tries to place students in the least restrictive environment, and I believe that that is a very good thing to do. Unfortunately, in this case, because of the child's level of distractibility, what they did was they tried to place him in a program that just would not have educated him in any way. Was there any evidence, though, that it was the other children that were the distractibility factor? Wasn't it kind of inherent where the one-to-one would address it? So I didn't recall seeing anything that said more children means this is going to be more problematic for this child. Well, the test is also two parts. It's not only whether he needs a BIP, a behavioral intervention program, because his behaviors interfere with his own education. The second step of that is whether his behaviors affect the students around him. Now, as an example, one of his interfering behaviors is the child continuously narrates the day's events as the day goes on. I'm not quite sure how a crisis paraprofessional will stop that behavior, but it will certainly interfere with the 60 percent of general education students in that classroom. So that, as just an example, it's not only a focus on him, although I am here to focus only on JP. I would just mention JC, if I'm permitted to. I am running out of time on the issue of ratios, and my quote is that given that a child, JC, is easily distracted, the number of students in the classroom counts, not just the ratio of students to adults. Let me ask you, just as a housekeeping matter, I thought that your argument was that there was no BIP, and yet we're pointed to 1551. Am I wrong or right about your argument? Part of my argument is that there's no FBA, Functional Behavioral Assessment, and no real BIP. No real BIP. I raised it out. This child has much more than five interfering behaviors, and they are required, by New York State law, and not to mention federal law and the IDEA, to deal with those behaviors, to try and fix those behaviors, to have a frequent assessment of those behaviors. Really the point is that it's not a proper BIP. At the bottom line, they did try and tease out five interfering behaviors and create one. I don't believe that that is appropriate, but they did tease out five interfering behaviors. Thank you very much. We'll reserve the decision.